UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                                      Case No. 1:21-cr-168

v.

                                      HON. JANE M. BECKERING

ROBERT HULSE,

     Defendant.

_____/

## **OPINION**

A December 14, 2021 Superseding Indictment charges Defendant, Robert Hulse, with five counts related to the receipt and attempted receipt, distribution, and possession of child pornography (ECF No. 20).  Now pending before the Court is Defendant's Motion to Suppress his statement (ECF No. 31) and Defendant's Motion to Dismiss the Indictment for spoliation of evidence (ECF No. 40).  The Government filed a response in opposition to both motions (ECF Nos. 38, 46).  Defendant filed a reply only to the motion to dismiss (ECF No. 47).  On June 1, 2022, the Court heard testimony from the parties on both motions, including from Special Agents Dan Gwyn and Timothy Kruithoff of Homeland Security Investigations, and Ashley Hulse, Defendant's wife.  After careful consideration of the hearing testimony, the interview audio, and the parties' written and oral arguments, the Court denies Defendant's motions for the reasons set forth below.

# I.    FACTUAL BACKGROUND

Defendant's motions arise from the execution of a search warrant and contemporaneous interview of Defendant at his home on June 28, 2017.

Prior to and leading up to the issuance of the search warrant at issue, on June 22, 2017, Special Agent Dan Gwyn of Homeland Security Investigations (HSI) was surveilling Defendant's neighborhood, attempting to connect to Defendant's Wi-Fi network.  This surveillance was part of an investigation into IP address 24.176.2.98, which was believed to be receiving and sharing child pornography.  Law enforcement discovered that the IP address at issue resolved to the Defendant's home address through Charter Communications.  Agent Gwyn obtained a search warrant for Defendant's home that day, based on three downloads of child pornography videos by law enforcement over a peer-to-peer network in October and November 2016 and January 2017.

The search warrant requested permission for officers to seize and search all electronic devices, including internet routers, and stated:

> "all hardware, software, and computer security devices necessary to access and examine the computer storage media. Peripheral equipment including printers, routers, modems, network equipment used to connect to the Internet may also contain evidence of what devices were used to connect to the Internet, who used those devices, and what actions the person(s) performed while using such devices."

(Continuation of Application for Search Warrant, ¶ 43, ECF No. 41-1 at PageID.192).

On June 28, 2017, pursuant to the authorized warrant, Agent Gwyn was conducting pre-search surveillance at Defendant's home.  Agent Gwyn saw Defendant's vehicle leave his garage and Agent Gwyn followed it to Defendant's place of employment, Pepsi, where Defendant entered through a side door.  Agent Gwyn returned to the area of Defendant's residence, where law enforcement held a pre-search briefing, and Agent Gwyn determined he would speak to Defendant

2

to see if Defendant would allow law enforcement entry into the home, so they would not need to force entry.

Special Agents Gwyn and Timothy Kruithoff, and a Portage Police Department officer departed for Defendant's workplace.  Agents Gwyn and Kruithoff removed all law enforcement identification and gear, including their tactical vests, and knocked on the door that Defendant had entered earlier.  When greeted by an employee, they identified themselves and told the employee they were looking for Defendant.  As the employee escorted them to a manager, the agents recognized Defendant in the hallway and asked if they could speak with Defendant privately. Defendant and Agents Gwyn and Kruithoff went into a private conference room, where the agents informed Defendant that they had a warrant to search his house for evidence of child pornography. Agent Gwyn testified that he told Defendant that he was not under arrest, and that he did not have to return to his house with them, but that Agent Gwyn was seeking Defendant's cooperation so that they did not need to force entry to Defendant's home or damage his property.  Agent Gwyn also testified that he told Defendant he would like to discuss the case.  Defendant agreed to return to his house and unlock his home for the agents.  Agent Gwyn asked Defendant if he "could hold onto his phone" for him and took Defendant's phone.

As they were leaving, the agents asked to search Defendant's vehicle in the parking lot of his workplace, but Defendant declined, as he did not want that to occur in potential view of his employer.  Agent Gwyn rode with Defendant in Defendant's vehicle back to his house and Agent Kruithoff followed.  Agent Gwyn testified that he rode in Defendant's car primarily out of concern that Defendant had access to a pistol, but that Defendant remained free to leave if he requested to do so.  According to Agent Gwyn, Defendant and Gwyn engaged in small talk during the drive, including discussion of Defendant's employment and engagement to his then-fiancé.  Agent Gwyn

testified that at no time during his presence at Defendant's employer or during the drive back to Defendant's house were handcuffs or Agent Gwyn's weapon displayed or visible, and that Defendant was aware that he did not need to cooperate, but Defendant chose to do so.

Outside of Defendant's house, six agents and several vehicles were waiting to execute the search warrant. Law enforcement opened the residence with the code Defendant provided at approximately 6:40 a.m. Agent Gwyn and Defendant waited in Defendant's car. When the house was secured, Defendant was asked to sit at his kitchen table so that Agent Gwyn and Portage Police Department (PD) Detective Bryan Taffee could ask him some questions. Law enforcement present during the interview and execution of the warrant included Agent Gwyn, Det. Taffee, and four other officers assisting with the search warrant from HSI and the Portage PD. Two uniformed officers left shortly after the house was secured.

### A.    The Interview

The interview was conducted at Defendant's kitchen table. According to Agent Gwyn, the table was adjacent to the kitchen, which had a door that led to the garage, and behind the table was a slider door that led to the back porch. The living room was also adjacent to the kitchen and kitchen table. Agent Gwyn testified that none of the doorways were blocked by law enforcement.

According to Agent Gwyn, Defendant was told he was free to leave, and that Agent Gwyn and Det. Taffee asked Defendant whether they could speak with him and ask him questions, and Defendant consented. At no time were any firearms drawn and Defendant was never handcuffed or otherwise restrained. Agent Gwyn testified that he told Defendant he was not under arrest and free to leave. Agent Gwyn stated that—out of a concern for the removal of evidence and to secure the scene of a search warrant—"[w]hat I tell people during search warrants [is] that they're free to leave but if you decide to leave, you cannot come back in. … [B]ecause we need to secure the

4

scene, I can't have somebody coming and going back and forth if I'm inside the residence."  Agent Gwyn could not recall whether he advised Defendant that he did not have to answer his questions.

Agent Gwyn and Det. Taffee proceeded to interview Defendant for 95 minutes, as recorded on Det. Taffee's iPhone.  Agent Gwyn and Det. Taffee asked questions of Defendant, beginning in a relaxed and friendly tone, such as how long Defendant owned the house, who his internet provider was, where his router was located, and requested details regarding Defendant's Wi-Fi network and password.  Agent Gwyn also asked Defendant about peer-to-peer file sharing, and Defendant denied using any such programs.  Agent Gwyn asked Defendant who had access or lived in his house, and Defendant raised suspicions about a neighbor.  They discussed pornography and videos downloaded from an eMule file-sharing software program at Defendant's IP address. Defendant denied any knowledge.  Defendant also mentioned that a lot of people could have guessed his Wi-Fi or router password, since it was the same from when he was fourteen or fifteen years old.  Defendant continued to "speculate" that his neighbor had used his IP address or wireless network.  Defendant specifically mentioned his neighbor's previous "bizarre and unsettling behavior," such as entering Defendant's house while Defendant was away and cutting a gap in Defendant's fence and installing a "secret gate."

During the interview, Agent Kruithoff occasionally entered the dining room with questions or statements directed to Defendant and related to the evidence or items Agent Kruithoff was finding during the search.[1]

---

[1] According to the Government, Agent Kruithoff "previewed" to Defendant devices he found in Defendant's home and evidence he located on Defendant's computer during the search that indicated an interest in underage females, such as use of eMule (peer-to-peer file sharing), the use of CCleaner (overwriting software), and two hard drives located in the garage containing evidence of child pornography and user attribution data.

The parties make different factual representations about the nature of Agent Gwyn and Det. Taffee's references to investigating Defendant's family, friends, neighbor, and employer. Defendant asserts that these were threats to his personal and professional life.  The Government asserts that such statements were made in response to Defendant's vague references to such individuals potentially having access to his house, computers, or router/IP address.  Agent Gwyn testified that Defendant's fiancé and employer would have potentially useful information to their investigation, such as verifying Defendant's whereabouts.  Agent Gwyn also testified that Defendant "would not admit" that he was the one who had been sharing the child pornography that was linked to his IP address and physical address, but that Defendant "alleged that his next door neighbor, while not necessarily stating that [Defendant] believed that the next door neighbor was the one that was sharing this child pornography, … was coming into [Defendant's] house [and] going ahead and taking things."

During the interview, Defendant first mentioned counsel by saying "I think I just need the advice from somebody who knows that can give me good advice" and "I probably, I mean if you guys are coming at me with all of this stuff then I probably need the advice of an attorney."  Agent Gwyn and Det. Taffee again sought clarification and continued to warn Defendant that "[w]hat you have been telling us is not truthful and you know that … A prosecutor is gonna know that it is not true. And the judges will know that it's not true" (Taffee) and "We're gonna continue …" (Gwyn) "Yep, that means Pepsi, fiancé, ex, neighbors." (Taffee) (Interview Audio, 52:34).  Det. Taffee also stated that "[a]t this point this [investigation] is a freight train that is going one way" and "Just tell us the truth" (*id.*, 1:08:00).

As the interview continued, Agent Gwyn and Det. Taffee continued to explain the nature of the charges and information against Defendant, and stated that "things end up better for people

that cooperate" (Gwyn), explaining that "better" meant "not getting your neighbors … work … ex … fiancé" or Defendant's family involved. (Taffee) (*id.*, 1:10:49).   Defendant again mentioned counsel, stating "I think before I answer any questions or talk further on any of that I do need the advice of an attorney."  In response, Agent Gwyn and Det. Taffee sought clarification, explaining that "it's a very clear line" and asked whether Defendant was "not willing to answer our questions at this point until you talk to an attorney?" (Taffee) (*id.*, 1:19:33).   Defendant then stated in response, "Well I mean, I, I definitely would need to talk to an attorney." (*id.*, 1:19:33).

Following this, Agent Gwyn expressed again that "it's a very specific line, Are you not willing to answer any more questions before you speak to an attorney?"  A five second pause followed where no one spoke.  Agent Gwyn then sought written consent to search Defendant's work and personal cell phones.  Defendant agreed and the agents provided appropriate forms.

The interview continued, and Agent Gwyn stated to Defendant that he was "beating around the bush about whether you want to talk to an attorney before answering any questions. What's the answer when it comes to that?"  Defendant stated, "Yeah, I need to talk to an attorney… I definitely need to be represented by an attorney."  Gwyn again asked, "So you're saying you don't want to answer any more questions without a lawyer?" and Defendant responded "Correct." (Interview Audio, 1:33:07).  Agent Gwyn and Det. Taffee then "encouraged" Defendant to "get away from the nonsense that you've been telling us" when speaking with his attorney, because it would "cost you a lot of money" and "the [attorney is] not going to be able to help you if you continue to lie." (Taffee) (*id.*).

The interview ended, and Defendant went to his back porch "for some fresh air." According to Defendant, Det. Taffee escorted him outside, and continued to push for a confession

before Agent Gwyn came outside and told Defendant to remain in his kitchen until the search was completed.

## B.      The Search and Seizure

The search of Defendant's home also lasted approximately one and a half hours.  Officers seized computer equipment, evidence relating to child pornography from Defendant's garage, and other items authorized on the warrant and potentially related to the alleged crimes.  The officers conducting the search located Defendant's internet router in the bedroom/computer room and took a photograph of the router (*see* ECF No. 41-2 at PageID.195).  The officers provided two custody receipts to Defendant, identifying the seized property (*see* ECF No. 41-3 at PageID.196–198).  The custody receipts do not list the router at issue.

Differing factual representations have been asserted by the parties as to whether the router was taken by the officers following the search.  Defendant's wife, Ashley Hulse, testified that the router was gone following the investigation, as she recalled not seeing it on top of the printer and not being able to connect to the internet following the search.  Agents Gwyn and Kruithoff both testified that the router was not seized because it was not "necessary" in light of the other evidence found at Defendant's house.  Specifically, Agent Gwyn testified that as the lead case agent, he did not feel it was necessary to seize the router and that a decision was made not to take the router, as evidenced on the custody receipts.  Agent Kruithoff testified at length about his experience as the computer forensic agent for the search warrant and his experience in computer forensics and child pornography investigations, generally.[2]  Agent Kruithoff testified that the router was not seized,

---

[2] Agent Kruithoff testified that he could recall the make but not the model of Defendant's router, but that typically, routers have three different types of memory: ROM (read only memory), RAM (random access memory), and nonvolatile or NV RAM.  Agent Kruithoff explained that ROM memory is saved in your settings and not typically erased when a router is unplugged, unlike RAM, which is typically erased when a router is unplugged, and NV RAM, which may or may not be

primarily because of what was found, namely "the thumb drive and the generic computer and then the hard drive" in the garage.  For that reason, Agent Kruithoff testified that there was no explicit conversation about not seizing the router, but that, "had [we] not been finding … the child pornography then we'd start looking at other avenues to make sure that we were at the right … house. And with what we found, I don't think we ever discussed it or even considered seizing the router."  Agent Kruithoff also testified that between his work with the Michigan State Police and over his career, routers were not often reviewed on scene during a search warrant, and that he has not seized many routers.  Further, Agent Kruithoff testified that it would be more pertinent to him in an investigation involving child pornography to know the information on the devices or an individual's guests' devices, rather than who was accessing the internet through a router.

Defendant maintains that his neighbor, or someone other than himself, used his computer equipment to commit the crimes for which he is charged.[3]  The parties dispute what efforts, if any, were required to investigate Defendant's claims regarding his neighbor.  The Government asserts that, because of the evidence found at Defendant's house, they were confident that Defendant was the person with an interest in child pornography and who had engaged in sharing child pornography.

Following the search of Defendant's house, the investigation continued, including contact with Pepsi, Defendant's employer, and Ashley Hulse, Defendant's then-fiancé, and now wife.

---

stored on the device, depending on whether certain settings, such as logging data, are enabled manually by the user in the router settings.  Logging data captures URLs visited, as well as computers or devices that are connected to the router, if enabled.  Last, Agent Kruithoff also testified regarding "port forwarding" as a sophisticated feature that is required to be manually turned on by a user on the router to enable the use of the eMule peer-to-peer sharing network.

[3] Defendant set up a "deer-cam" in his garage, seeking to catch his neighbor, and claims that on July 7, 2017, the camera captured his neighbor breaking into Defendant's garage and "snooping" around the file cabinet where the bulk of the incriminating evidence was found (*see* ECF No. 44-4 at PageID.199).

Ashley Hulse testified that, when interviewed by Agent Gwyn and Det. Taffee, she asked the investigators why they had not yet interviewed Defendant's neighbor, and described the neighbor's "weird" behavior, including the secret gate the neighbor installed in Defendant's fence, and the neighbor's behavior that led Defendant and Ashley to believe the neighbor was accessing the house while they were away.   In December 2018, Agent Gwyn interviewed Defendant's neighbor, Eugene Miller.[4]  Agent Gwyn testified that he did not search or seize the neighbor's computers, because he did not believe he had probable cause to do so, as he "had nothing linking Mr. Miller to child pornography."

On July 10, 2017, Agent Gwyn filed with the Court a Property Return, referencing one of the two custody receipts, including 14 of the 16 items seized.  The return was signed and certified as correct.  According to Defendant, the second custody receipt was altered after the fact to reflect that (1) Agent Gwyn signed the unsigned inventory as the "Seizing Officer," although he was not, (2) that the time of seizure was changed from 6 a.m. to 7 a.m., initialed "JS," and (3) additional case information was added.  The Amended return was submitted to the Court four days later, certifying that Agent Gwyn spoke with the forensic examiner and that the Government had seized 14 items of "digital media" to be examined within 45 days.

On September 22, 2021, the grand jury returned an Indictment against Defendant, charging him with receipt, distribution, and possession of child pornography.  At the initial pretrial conference, the Government notified Defendant that they intended to rely on information found on 7 of the 16 items seized during the execution of the search warrant, as well as "other electronic media and storage devices."  The Government provided and the Defendant reviewed various

---

[4] Agent Gwyn could not recall the specifics of the interview but testified generally that his recollection of his report was that Defendant's neighbor had been in Defendant's house "a couple of times" but never used Defendant's computer or wireless password or information.

discovery materials in Fall 2021 and Winter 2022.   On March 3, 2022, Defendant's consultants, hired to review the seized digital equipment, asked to inspect the router.  Neither party admits to having possession of the router at present, and its location is unknown.

The grand jury returned a Superseding Indictment on December 14, 2021 (ECF No. 20) adding a charge for Receipt and Attempted Receipt of Child Pornography and expanding the forfeiture allegation to include Counts 1 through 5.

## II.      ANALYSIS

### A.      Defendant's Motion to Suppress

Defendant makes three arguments in support of his motion to suppress: (1) Defendant's statement was taken in violation of *Miranda v. Arizona*; (2) Defendant's statement was involuntarily coerced; and (3) Defendant was subject to improper threats and his invocation of counsel was ignored.

### 1.    Miranda Violation

Defendant argues that law enforcement conducted a custodial interrogation without first advising him of his *Miranda* rights (ECF No. 32 at PageID.75).  Specifically, Defendant alleges that, under the totality of the circumstances, the interrogation was custodial because he did not believe that he was free to leave.  In support of his argument, Defendant contends that: law enforcement went to his place of employment and told him they would break down his door, and then "flanked" him and kept him under "the watchful eye of an armed guard" while questioning him (*id.* at PageID.79); Defendant was questioned for over 90 minutes and threatened professionally and personally (*id.* at PageID.80); Defendant's freedom was significantly restrained, he could not leave his home, his phones were taken, and when he showed hesitation, he was pressed and threatened by the officers (*id.* at PageID.80–81); and Defendant asserts that he

11

was never told that he could leave or refuse to answer questions, nor that he was not under arrest (*id.* at PageID.81–82).

In response, the Government asserts that the interview in Defendant's home was not a custodial interrogation, therefore *Miranda* warnings were not required and the exclusionary rule of *Miranda* does not apply (ECF No. 38 at PageID.108).  Specifically, the Government argues that a reasonable person in Defendant's situation would not have believed they were in custody because: Defendant had voluntarily returned to his home with the officers and agreed to answer questions, and the interview took place in Defendant's home (*id.* at PageID.110).  The Government further asserts that Defendant was only questioned for an hour-and-a-half and the manner of questioning was conversational (*id.* at PageID.112), in an unlocked room, with no restraint on his movement (weapons or handcuffs) (*id.* at PageID.113).  Last, the Government argues that Defendant was told he was not under arrest at his office and was free to leave at his home—"he just could not go back and forth in and out of the house while it was being searched" (*id.* at PageID.114) (citing *United States v. Saylor*, 705 F. App'x 369, 375 (6th Cir. 2017)).

*Miranda v. Arizona* held that "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. [C]ustodial interrogation … mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436 (1966); *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody'").

12

A suspect is in custody for *Miranda* purposes when the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). The *Miranda* test requires an examination of: (1) the totality of the circumstances surrounding the limitations on the suspect's freedom, *see Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Berkemer*, 468 U.S. at 437–38; and (2) what a reasonable person in the suspect's position would have thought about his freedom to leave knowing the facts available to him, *see Thompson*, 516 U.S. at 112; *Stansbury v. California*, 511 U.S. 318, 323 (1994).

There are four, non-exhaustive factors to consider in determining whether an individual is in custody: (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions. *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017) (quoting *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010)).

The key question here is whether or not Defendant was "in custody" for purposes of *Miranda*. "While any encounter with law enforcement officials may have coercive aspects to it, simply by virtue of the fact that the official is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime, investigators are not required to administer *Miranda* warnings to everyone whom they question." *United States v. Panak*, 552 F.3d 462, 471 (6th Cir. 2009).

Looking to the relevant factors, first, the location of the interview was Defendant's home, which is generally non-custodial. *Coomer v. Yukins*, 533 F.3d 477, 487 (6th Cir. 2008) ("While an interrogation in one's home is not determinative alone of the custodial inquiry, it is usually

indicative of the absence of the isolation inherent in custodial interrogations."); *Panak*, 552 F.3d at 466 ("an in-home encounter between the police and a citizen generally will be non-custodial"); *Saylor*, 705 F. App'x at 372–73 (finding that, although the defendant's residence was a halfway house, that did "not make it the kind of 'inherently intimidating' environment that would have made [the defendant] feel 'constrained or intimidated'") (quoting *United States v. Salvo*, 133 F.3d 943, 950–51 (6th Cir. 1998)).  Here, the factors that turn the home, "an inherently comfortable and familiar environment into one that a reasonable person would perceive as unduly hostile, coercive and freedom restraining" were not present, namely: a large "number of officers, the show of authority, the conspicuous display of drawn weapons, [and] the [threatening or coercive] nature of the questioning[.]"  *Panak*, 552 F.3d at 466.

Second, as to the length and manner of the questioning, Defendant was questioned for only an hour-and-a-half, and the manner of questioning remained in a "matter-of-fact" and conversational tone throughout.  *See United States v. Mahan*, 190 F.3d 416, 420 (6th Cir. 1999) ("hour and thirty-five minute[]" interview non-custodial; agent never brandished a gun or handcuffs, interviewed defendant in an unlocked room, and made no promises to induce cooperation or threats of violence); *United States v. Flores*, 193 F. App'x 597, 606 (6th Cir. 2006) (finding non-custodial interview where the defendant was in his home, not handcuffed, confined, or restrained, and sat on his sofa and had a "casual conversation" with the officer).

As to the third factor, whether there was any restraint on Defendant's freedom of movement, Defendant was in an unlocked room with two officers, sometimes a third officer; there were no weapons or handcuffs; and Defendant's freedom of movement was not so restrained (for example, being surrounded by armed officers) such as to "transform one's castle into an interrogation cell[.]"  *Panak*, 552 F.3d at 466; *see also Saylor*, 705 F. App'x at 375 (monitoring

14

and handcuffing residents during the execution of a search warrant at halfway house did not mean the residents were in custody; finding at home interview where defendant made incriminating statements to be non-custodial where interview lasted 30 minutes, was "conversational," and suspect was in an unlocked room with two agents).

Last, Defendant was advised that he was not under arrest, was never arrested following the interview, and was told by the officers that he was free to leave his home. *See United States v. Holt*, 751 F. App'x 820, 824 (6th Cir. 2018) (during interview at U.S. Attorney's satellite office in the courthouse "critically, the prosecutor immediately told Holt that he was not in custody, that all he had to do was have his photograph and DNA sample taken, and that after that was completed he was free to go"); *see also United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003) ("[m]ost important to our analysis, though, is that [the defendant] was explicitly told by [the law enforcement agent] that he was not under arrest and that he did not have so speak with him if he did not choose to"). Although Agent Gwyn could not recall whether he told Defendant he did not have to answer his questions, in light of the totality of the circumstances, this alone is not enough to render the situation custodial. *See Saylor*, 705 F. App'x at 376 ("It is undisputed that the officers did not [tell the defendant that he did not need to answer their questions]. Although this factor cuts against the Government, it cannot alone redeem Saylor's cause.") (quoting *Panak*, 552 F.3d at 467, "[w]e have never held that [this instruction] is a necessary condition (as opposed to a frequently sufficient condition) before officers may question an individual in a non-custodial setting. … [i]t would be strange … to say that a telltale sign of whether an individual must be Mirandized is whether the officer gave the individual one of the *Miranda* warnings.").

Thus, this Court determines that *Miranda* warnings were not "required in this case because [Defendant] was not in custody at the time of the questioning." *United States v. Jewell,* 16 F. App'x 295, 297 (6th Cir. 2001).

    2.   <u>Involuntary Statement</u>

Defendant next argues that law enforcement coerced statements from Defendant by threatening to make the investigation public (including his family and employer) (*id.* at PageID.82), such that his will was overborne (*id.* at PageID.84–85).

The Government responds that Defendant's statements were not coerced, as there was no objectively coercive police activity and Defendant's will was not overborne (*id.* at PageID.116–121) (citing *United States v. Phillips*, 230 F. App'x 520 (6th Cir. 2007)).

"When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *Mahan*, 190 F.3d at 422. To prove an unconstitutional confession, "coercive police activity is a necessary predicate to finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "[W]hen determining whether police coercion rendered a defendant's statement involuntary, we inquire whether, considering the totality of the circumstances, law enforcement overbore the will of the accused." *Bray v. Cason*, 375 F. App'x 466, 469 (6th Cir. 2010) (citing *Mincey v. Arizona*, 437 U.S. 385, 401–02 (1978)); *see also United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) (quoting *Mahan*, 190 F.3d at 422).

"Relevant factors in this inquiry include the defendant's age, education and intelligence, his previous interactions with the criminal justice system, the length and extent of questioning, and the use of physical coercion such as deprivation of food or sleep." *United States v. Clayton*, 937 F.3d 630, 641 (6th Cir. 2019) (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)).

Thus, a statement will be deemed involuntary if three criteria are satisfied: (i) that the police engaged in "objectively coercive" activity;[5] (ii) that "the coercion in question was sufficient to overbear the defendant's will;" and (iii) that "the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Mahan*, 190 F.3d at 422 (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)); *United States v. Hunter*, 332 F. App'x 285, 288–89 (6th Cir. 2009).

First, the Court determines that there was no objectively coercive police activity.  Like in *Philips* and *Mahan*, the statements by law enforcement were not physically threatening, nor did they imply that Agent Gwyn or Det. Taffee would be more or less lenient in their investigation of Defendant.  As stated in *Philips*:

> [N]othing about what Agent Rinehart said carried any implication that [Defendant] was physically at risk. Nor did the questioning imply that, if [Defendant] would confess, the agents would think him less of a monster, [or] would be lenient in their investigation of him … What Agent Rinehart not so subtly implied is that the agents' questions concerned a serious criminal matter, one that could lead to considerable jail time. … Focusing a suspect's attention on the potential legal consequences of his actions is not self-evidently coercive; indeed, it is more likely to focus the mind on the importance of answering questions accurately, voluntarily or not at all."

230 F. App'x at 524–25 (citing *Mahan*, 190 F.3d at 423 (agent statement that "lying could get [defendant] in serious trouble" was not coercive; the agent "made no promises to induce [defendant's] cooperation, nor did he make any threats of physical violence")).

Rather, the statements of Agents Gwyn and Det. Taffee conveyed the seriousness of the situation to Defendant and the reality of what their investigation would necessarily entail.  Agent Gwyn and Det. Taffee "focused" Defendant's attention on the fact that Defendant's references to

---

[5] "An involuntary confession may result from psychological, no less than physical, coercion by law enforcement officials."  *Ledbetter*, 35 F.3d at 1067.

his ex-girlfriend and neighbor would require the agents to contact such individuals, and, for example, to contact or subpoena his employer to "investigate his alibi," or verify his whereabouts during certain time periods where the internet was accessed and the data in question was downloaded. At its worst, Agent Gwyn's statement that the investigation was like a "freight train" still did not rise to the level of objectively coercive. Instead, the statement served to inform Defendant of the seriousness of the federal investigation facing him, and the next steps that the agents would take. "[I]t is well-settled that in order to impact upon the custody determination, the communication of [statements regarding the status of investigation or incriminating evidence] must somehow relate to the suspect's freedom of action." *Saylor*, 705 F. App'x at 375 (quoting *Salvo*, 133 F.3d at 952–53) (statements to the defendant that he was not under arrest, was free to leave, and would not be placed under arrest following interview "mitigated against any possibility that the statements pertaining to future prosecution could lead a reasonable person to feel as though he was in custody at that time").

While law enforcement may have disregarded Defendant's unequivocal invocation of counsel, the totality of the circumstances is such that Defendant's statements were not involuntarily made in response to coercive police activity that was sufficient to overbear Defendant's will.

In fact, Defendant did not "offer a different statement after the allegedly coercive behavior"—the interview audio evidences that Defendant continued to deny any knowledge or wrongdoing—and as such, even if the conduct in question was objectively coercive, it was not "sufficient to overbear the [D]efendant's will," and such conduct was not the "crucial motivating factor" in Defendant's decision to offer any statement. *Hunter*, 332 F. App'x at 288–89; *Mahan*, 190 F.3d at 422.

3.    <u>Right to Counsel</u>

Defendant also argues that law enforcement improperly threatened Defendant when he invoked his right to counsel (*id.* at PageID.85) and prolonged the interrogation despite Defendant's clear and unequivocal invocation of counsel (*id.* at PageID.90).

In response, the Government argues that Defendant was not threatened by police; instead, the officers were indicating that they "would have to interview the people he had implicated as having access to his devices or internet" or otherwise continue their investigation with his employer (*id.* at PageID.121–123).

If a suspect in custodial interrogation, "[has] expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *Davis v. United States*, 512 U.S. 452, 459 (1994) (for request to stop a custodial interrogation, "the suspect must unambiguously request counsel").

Because Defendant "was not in custody for purposes of *Miranda* . . . *Edwards* does not apply." *United States v. Martin*, 95 F. App'x 169, 178 n. 8 (6th Cir. 2004). Thus, Defendant's request for counsel, "if made and disregarded, would at most be considered as part of the totality of the circumstances in determining whether Defendant's statements during a non-custodial interview were involuntarily made in response to coercive activity." *United States v. Assi,* 512 F. Supp. 2d 1047, 1055 (E.D. Mich. 2007).

In sum, because Defendant was not in custody under *Miranda*, and has not shown that his statement was involuntary, Defendant's motion to suppress is denied.

### B.    Defendant's Motion to Dismiss

1. <u>Failure to Preserve</u>

Defendant argues that the Government acted in bad faith when it failed to preserve the internet router as evidence—a critical and potentially exculpatory piece of evidence to the defense that cannot be obtained by comparable means and thus the Indictment should be dismissed (ECF No. 47 at PageID.298).

Defendant first argues that law enforcement acted in bad faith by failing to follow Fed. R. Crim. P. 41 and proper chain of custody principles, when it mistakenly or recklessly failed to seize the router (*see* ECF No. 41 at PageID.167–171).  Defendant contends that the exculpatory value of the router was apparent, as evidenced by the Government's own search warrant application, and its focus on the router during the interview of Defendant (*see id.*).

In response, the Government contends that there was no bad faith, and the exculpatory value of the router was not apparent (ECF No. 46 at PageID.274).  First, The Government states that investigators believed, based on the other evidence at the scene, that Defendant was "the person who used eMule to disseminate child pornography" and that the router was "just as likely to be inculpatory as it was exculpatory—if it logged devices at all" (*id.* at PageID.274, 256–276). Second, regardless of the router's exculpatory value, the Government argues that negligence is insufficient for Defendant to meet his burden of showing bad faith (*id.* at PageID.274) (citing *United States v. Turner*, 287 F. App'x 426, 432–33 (6th Cir. 2008)).  Third, the Government asserts that the duty to retain and preserve evidence is not "undifferentiated and absolute" (*id.* at PageID.276).  Fourth, the Government asserts that Defendant *could* obtain comparable evidence by other reasonable means because the Government did not seize or review the router (*id.* at PageID.278).

In his reply brief, Defendant argues that the Government's "conscious choice" to ignore evidence and a search warrant requiring they seize the router was bad faith because, "[i]nvestigators believed that they had enough evidence and, therefore, could, in their sole discretion, stop collecting evidence from the alleged crime scene" (ECF No. 47 at PageID.298).

The parties agree that the *Youngblood* standard applies.[6] "Potentially useful evidence is that 'of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" *United States v. Hofstetter*, 31 F.4th 396, 430 (6th Cir. 2022). "In such a case, the defendant must show: (1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Jobson*, 102 F.3d 214, 219 (6th Cir. 1996) (citing *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988)).

"The first two elements of this tripartite test are inter-related. 'The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.' To

---

[6] As opposed to the *Trombetta* standard, which applies when the exculpatory value of the evidence is not in dispute. *See California v. Trombetta*, 467 U.S. 479, 488–89 (1984) (Under the Due Process Clause of the Fourteenth Amendment, law enforcement's duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, … evidence must both (1) possess an exculpatory value that was apparent before the evidence was destroyed, and (2) be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.") (citation omitted). "[A] defendant's due process rights are violated when material exculpatory evidence is suppressed, regardless of whether the suppression results from good or bad faith. … But when the government 'fails to preserve evidence whose exculpatory value is indeterminate and only 'potentially useful' to [a] defendant, [courts] apply a different test.'" *United States v. Hofstetter*, 31 F.4th 396, 430 (6th Cir. 2022) (citations omitted).

establish bad faith, then, a defendant must prove 'official animus' or a 'conscious effort to suppress exculpatory evidence.'" *Jobson*, 102 F.3d at 218 (quoting *Youngblood*, 488 U.S. at 56–57 n. *, 58 ("unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"); citing *Trombetta*, 467 U.S. at 488); *see also Hofstetter*, 31 F.4th at 430 (finding "no suggestion of animus" where government did not review the content of the files before they were destroyed, there was no evidence that the government suspected the files were exculpatory, and the evidence was destroyed as part of a "standard, state-mandated file closure process").

Defendant contends that the Government was aware of the critical importance of the router prior to its seizure and subsequent misplacement (ECF No. 41 at PageID.169–170).   The Government asserts that investigators believed, based on the evidence on the scene, that Defendant was responsible for the alleged crimes, and the router was "just as likely to be inculpatory as it was exculpatory," and therefore it was not reviewed or seized by the officers (ECF No. 46 at PageID.274, 256–276).   Additionally, this Court heard testimony from both Agents Gwyn and Kruithoff as to the potentially useful or relevant value of internet routers, due to the user-dependent settings and memory storage.

Because the router's exculpatory value was not apparent before it was "destroyed" or misplaced, the router can only be said to be "potentially useful evidence" that, "could have been subjected to tests, the results of which might have" exculpatory value.  *Hofstetter*, 31 F.4th at 430; *see also Collins*, 799 F.3d at 570; *Wright*, 260 F.3d at 571; *People v. Thomas*, 217 WL 1967475, at * 6–7.  The evidence shows that the Government did not seize or review the router following

22

the execution of the search warrant.[7]   As in *Thomas*, here, the evidentiary value of the router is likely overstated, as Agent Kruithoff explained, "a router could be capable of storing its logging history, but only if that feature has been activated" by the user, and that the "feature typically is not turned on by default" and if it is, it usually only logs a certain amount of data before it begins to overwrite itself, and "the logging information must be viewed or examined at the scene." *People v. Thomas*, No. 329750, 2017 WL 1967475, at *6–7 (Mich. Ct. App. May 11, 2017).   Further, Agent Kruithoff testified that the more pertinent or more relevant evidence in a child pornography investigation is what is on a target's devices, rather than who has accessed the internet through their router.

More importantly, Defendant has not shown bad faith on behalf of the Government. Under Sixth Circuit precedent, where the exculpatory value at the time the evidence was lost or destroyed is not apparent, Defendant must prove bad faith by a showing of "official animus" or a "conscious effort to suppress exculpatory evidence." *Jobson*, 102 F.3d at 218.

Defendant primarily argues that the Government's decision not to collect and preserve the router enumerated in the search warrant constitutes bad faith because it was part of a conscious effort to suppress evidence that was not within their discretion (ECF No. 47 at PageID.299).[8] Defendant also asserts that the officers "only searched for and seized evidence that they believed proved [Defendant]'s guilt" and this was a "conscious effort to suppress" exculpatory evidence under *Jobson* (*id.* at PageID.302).

---

[7] Even if the Court were to conclude that the Government did take the router, in light of Ashley Hulse's testimony, there is no evidence that it was lost or destroyed in bad faith.

[8] Defendant initially argued that the Government was "at a minimum negligent" by failing to adhere to reasonable standards of care for seizure of evidence, or reckless for failing to seize the router.  However, negligence is not sufficient for a showing of bad faith. *Turner*, 287 F. App'x at 432–33 ("A showing that the government was negligent, even grossly negligent, is insufficient to establish bad faith.") (citation omitted).

However, both agents testified that it was because of the volume and nature of the evidence found during the execution of the search warrant on Defendant's own devices that led them to believe it was not necessary to seize the router. That is, their decision was not based on any "official animus" or "conscious effort to suppress evidence" but was a conclusion, based on their experience and training, that they had sufficient evidence indicative of Defendant's involvement and that the router likely did not have exculpatory value, or additional inculpatory value. *See United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001) (holding that bad faith did not exist where the evidence was only "potentially useful," as "[t]he heart of [the defendant's] argument is that the destruction of … evidence prevented his expert from conducting future tests, the results of which may have exonerated him"); *United States v. Collins*, 799 F.3d 554, 570 (6th Cir. 2015) (finding no spoliation where methamphetamine equipment was destroyed before it could be fingerprinted where defendant alleged prints might have linked the equipment to another individual because there was "no apparent exculpatory value to the destroyed items" and defendant did not show "evidence was destroyed because of 'official animus' or a 'conscious effort to suppress exculpatory evidence'" under *Youngblood*); *see also Hofstetter*, 31 F.4th at 430 (finding "no suggestion of animus" where government did not review the content of the files before they were destroyed, there was no evidence that the government suspected the files were exculpatory).

Thus, Defendant has failed to make a requisite showing of bad faith.[9]

---

[9] Defendant also argues that the agents acted in bad faith by not taking the router when they were "ordered" by the Court to do so based on the express language of the search warrant (*see, e.g.,* ECF No. 47 at PageID.301–302). However, Defendant presents no controlling authority, and this Court has not located any, that states that a search warrant constitutes a mandate that law enforcement must seize each and every item in the house identified in the warrant without discretion. The cases cited by Defendant, including *Marron v. United States*, 275 U.S. 192, 196 (1927), protect against general searches and seizures for items *outside* of the scope of a search warrant. To adopt Defendant's argument would be to state that the failure to seize any number of "potentially useful" items authorized as within the scope of the warrant would amount to a

Last, Defendant argues that the Government's failure to preserve the router and failure to "conduct any timely and meaningful investigation into [Defendant]'s neighbor" caused Defendant's loss of "the only other opportunity to preserve evidence that could have sufficiently replaced" the router (*id.* at PageID.171).  As discussed above, because the evidentiary value of the router, prior to and following it being lost or destroyed, was not apparent, this Court cannot determine that the nature of the evidence is such that Defendant would be unable to obtain comparable evidence by other means.  *Jobson*, 102 F.3d at 219.  Further, Agent Gwyn testified that although Defendant repeatedly referenced his neighbor or realtor potentially having had access to his house, Defendant did not go so far as to allege that they were the individuals responsible for the download and sharing of child pornography, and not Defendant.  Agent Gwyn also testified that he did not believe he had probable cause to seize the neighbor's computers or routers, as he had "nothing linking" the neighbor to child pornography.

Since Defendant has failed to show the requisite bad faith on the part of law enforcement, "failure to preserve [the] potentially useful [router] does not constitute a denial of due process of law[.]" *Youngblood*, 488 U.S. at 58.

---

constitutional violation, such as "books" or "credit card information" (*see* ECF No. 41-5 at PageID.209, 231).  The application for a search warrant, by its express terms, states that it "may … be necessary to seize" certain items, and that routers and other peripheral equipment "may … contain evidence" related to the use of the internet and the receipt and distribution of child pornography (*id.* at PageID.227).  As stated elsewhere, "failure to preserve potentially useful evidence does not constitute a denial of due process of law" absent a showing of bad faith. *Youngblood*, 488 U.S. at 58.  Agent Kruithoff testified that they routinely do not seize all items that they may be authorized to seize in the course of an investigation, such as "a grandmother's computer" that is not connected to the main target of the child pornography investigation in a home.  Further, Defendant wholly fails to support the proposition that the failure to seize the router was intended to sabotage or suppress potentially exculpatory evidence.

2.  Adverse Jury Instruction

Alternatively, Defendant argues that he is entitled to an adverse jury instruction—"that the government lost the router, and that the jury may infer that [Defendant]'s neighbor used [Defendant's] router to download and share illicit images" (ECF No. 41 at PageID.174).

In response, the Government asserts that there is no basis for a jury instruction on spoliation here because Defendant failed to show the Government was required to preserve the router and, even if it had, Defendant failed to show the evidence was favorable to his defense (*id.* at PageID.280–281), and spoliation instructions are not warranted in the absence of a showing of bad faith (*id.* at PageID.281–282).

"A party seeking an adverse inference instruction based on the destruction of evidence must establish: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *United States v. Braswell*, 704 F. App'x 528, 534 (6th Cir. 2017) (quoting *Flagg v. City of Detroit*, 715 F.3d 165, 177 (6th Cir. 2013); *see Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010).

*(1) Obligation to Preserve.*  There is no "undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58 ("requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it"); *see also Wright*, 260 F.3d at 571.

26

*(2) Culpable State of Mind.* "[S]poliation only occurs when the party who destroyed the evidence acted with 'the purpose of rendering it inaccessible or useless'" to the defendant in preparing its case. *Braswell*, 704 F. App'x at 535–536 (citing *Boxley*, 373 F.3d at 762 (defining spoliation and intentional destruction)). "The United States Court of Appeals for the Sixth Circuit has required a showing of bad faith to justify an adverse inference from spoliation of evidence." *United States v. Bell*, No. CR 17-20183, 2022 WL 1288653, at *1, n. 1 (E.D. Mich. Apr. 29, 2022) (citing *Braswell*, 704 F. App'x at 535); *see also, e.g., Braswell*, 704 F. App'x at 536 (scene photographs were not preserved, but "[w]hile the effect of [the officer]'s actions was to render the photographs useless, … his actions were not undertaken in bad faith, but were instead the result of shoddy police work. … [W]e agree that the spoliation instruction was not required"); *Boxley*, 373 F.3d at 763 ("the most that has been shown is that the policemen did not maintain and control the evidence in a manner consistent with good police tactics. But there was no bad faith involved" thus "the motion for a jury instruction on spoliation was properly denied").

*(3) Relevance.* "A violation of [the Due Process Clause] requires some showing that the evidence lost would be both material and favorable to the defense[.]" *United States v. Vaughn*, 444 F. App'x 875, 879 (6th Cir. 2011) (finding defendant "complain[ed] that his own expert never had an opportunity to test the marijuana from the transaction, yet he fails to show that such testing would prove favorable"); *see United States v. Darden*, 346 F. Supp. 3d 1096, 1113 (M.D. Tenn. 2018) ("[b]are assertions,' vague allegations, and speculation will not suffice to show prejudice") (citations omitted).

Defendant has failed to show that he is entitled to an adverse inference jury instruction, because Defendant has not shown bad faith. "[S]poliation only occurs when the party who destroyed the evidence acted with 'the purpose of [intentional destruction, or of] rendering it

inaccessible or useless'" to the defendant in preparing its case.  *Braswell*, 704 F. App'x at 535–536.  Agents Gwyn and Kruithoff both testified that the router was never seized, and that the reason it was not seized was because of the significant amount of evidence they found at Defendant's home during the execution of the search warrant.

A conscious decision not to seize peripheral equipment, such as the router, does not rise to the level of bad faith, defined as "official animus" or a "conscious effort to suppress evidence." No testimony was offered that indicated there was an official animus behind the investigation into Defendant that resulted in the refusal to seize the router.  No testimony was offered that the decision not to seize the router was a conscious effort to suppress evidence.  In fact, the router "may" or "may not" have held the necessary logging or identification data; and unplugging or removing the router may have erased some, but not all, of the router's memory.  Further, Agent Kruithoff testified that, in his experience with hundreds of child pornography investigations, HSI does not review on scene or seize routers as a matter of course.

### III.    CONCLUSION

Defendant's Motion to Suppress (ECF No. 31) and Defendant's Motion to Dismiss (ECF No. 40) are denied.  An Order consistent with this Opinion will be entered.


Dated:  June 8, 2022                                            /s/ Jane M. Beckering
                                                           JANE M. BECKERING
                                                           United States District Judge